ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL V

| | | |
|---|---|---|
| CENTRO DE PERIODISMO INVESTIGATIVO, INC.<br><br>Apelada<br><br>v.<br><br>CARLOS MELLADO LÓPEZ, en su capacidad oficial como SECRETARIO DEL DEPARTAMENTO DE SALUD; WANDA LLOVET DÍAZ, en su capacidad oficial como directora del REGISTRO DEMOGRÁFICO DE PUERTO RICO; ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Apelante | KLAN202400093 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm.:<br>SJ2023CV09564<br><br>Sobre:<br>*Mandamus;* Derecho Constitucional de Acceso a la Información Pública |

Panel integrado por su presidente, el Juez Hernández Sánchez, la Jueza Romero García y la Jueza Martínez Cordero.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 15 de marzo de 2024.

Comparece el Gobierno de Puerto Rico por sí y en representación del Hon. Carlos Mellado López, en su capacidad oficial como Secretario del Departamento de Salud (en adelante, Secretario de Salud) y de la señora Wanda Llovet Díaz (en adelante, señora Llovet Díaz), en su capacidad oficial como Directora del Registro Demográfico de Puerto Rico (en conjunto, el Estado o apelante), representado por la Oficina del Procurador General de Puerto Rico, para solicitarnos la revisión de la *Sentencia* emitida y notificada 8 de enero de 2024, por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, TPI o foro primario).[1] Mediante la *Sentencia* apelada, el foro primario declaró *Ha Lugar*

---

[1] Apéndice del recurso, a las págs. 539-585.

Número Identificador

SEN2024_____

una Petición de *Mandamus* instada por el Centro de Periodismo Investigativo, Inc. (en adelante, CPI o apelada) y, en consecuencia, ordenó al Estado a producir los documentos solicitados por la parte apelada.

Por los fundamentos que expondremos a continuación, se *modifica* la *Sentencia* apelada y así modificada, se confirma.

I

El 11 de octubre de 2023, el CPI presentó una *Petición de Mandamus* (Petición) sobre el derecho constitucional de acceso a la información pública.[2] En la *Petición*, la parte apelada inició esbozando que en los últimos años había instado varias peticiones de *Mandamus* contra el Estado, en la cual le solicitaba acceso a documentos del Registro Demográfico de Puerto Rico (en adelante, Registro Demográfico). Precisa resaltar que, con la *Petición* ante nos, este es el cuarto recurso de *Mandamus* que ha instado el CPI. En esa dirección, la parte apelada alegó que, como parte de varias investigaciones realizadas, el 7 de febrero de 2018, instó una *primera* petición de *Mandamus* para que el apelante suministrara la base de datos sobre mortalidad, así como los certificados de defunción emitidos en Puerto Rico desde el 18 de septiembre de 2017, hasta la fecha de divulgación de dichos datos. Sostuvo que la parte apelante se negó a proveer la referida información bajo el planteamiento de que esos datos eran confidenciales. Indicó que, allá para el 4 de junio de 2018, el TPI emitió una *Sentencia*,[3] y resolvió que la información solicitada por el CPI era pública y por tanto correspondía ordenar su divulgación bajo la única condición de que se borraran los números de seguro social contenidos en los documentos.[4]

---

[2] Apéndice del recurso, a las págs. 1-82.
[3] En el alfanumérico SJ2018CV00843 consolidado con el SJ2018CV00561.
[4] Apéndice del recurso, a las págs. 31-57.

Por otro lado, la parte apelada adujo que, el 28 de abril de 2020, el CPI presentó una *segunda* petición de *Mandamus* contra el Estado, en la que, una vez más, le solicitó la base de datos de mortalidad en Puerto Rico, pero esta vez para el periodo de 2007 al 2020.[5] Esbozó que posterior a esto, la señora Llovet Díaz entregó la información solicitada y se acordó que las futuras peticiones sobre entregas de información se canalizarían ante la Directora de la Oficina de Comunicaciones de Asuntos Públicos del Departamento de Salud. Como consecuencia de ello, el CPI destacó que el TPI emitió una *Sentencia* por desistimiento.[6]

Asimismo, la apelada sostuvo que, el 23 de agosto de 2021, el CPI presentó una *tercera* petición de *Mandamus* contra el Estado,[7] dado a que se les había solicitado la base de datos de mortalidad en Puerto Rico, pero esta vez para los años 2020 y 2021 y, en esta ocasión, el Estado entregó copia de la información solicitada suprimiendo ciertos campos, los cuales ya habían sido previamente divulgados. Sostuvo que tras varios tramites, el foro primario ordenó la divulgación de los datos requeridos por el CPI y el apelante acató dicha directriz. Por consiguiente, el 6 de octubre de 2021, el TPI emitió una *Sentencia* por desistimiento.[8]

La parte apelada continuó su escrito narrando que, en cuatro (4) ocasiones durante el periodo contenido entre agosto de 2022, hasta enero de 2023, el CPI solicitó las versiones más actualizadas de la base de datos de mortalidad en Puerto Rico y ante estas solicitudes, la parte apelante se allanó y entregó lo solicitado. Sin embargo, el CPI argumentó que, el 5 de junio de 2023, en respuesta de una solicitud que le hiciera una periodista del CPI el 26 de mayo de 2023, el Estado entregó la base de datos con varios campos

---

[5] En el alfanumérico SJ2020CV02641.
[6] Apéndice del recurso, a la pág. 61.
[7] En el alfanumérico SJ2021CV05403.
[8] Apéndice del recurso, a la pág. 62.

suprimidos, entre los cuales destacaban los nombres, apellidos y direcciones de los difuntos e informantes, datos que ya habían sido previamente entregados. Explicó que, al cuestionar la razón de esta acción, el 14 de junio de 2023, el apelante le envió un correo electrónico suscrito por el Secretario de Salud, en el cual este estaba invocando disposiciones de la *Health Insurance Portability and Accountability Act of 1996* (HIPAA) y por ello suprimió la información.[9]

Inconforme con la respuesta, el CPI presentó la *Petición* de autos y le solicitó al tribunal *a quo* que ordenara al apelante a cumplir con su deber ministerial de entregar la siguiente información: "[l]a base de datos de defunciones actualizada del Registro Demográfico para el año 2022 y 2023, y hasta lo más reciente disponible, en formato Excel, tal como se ha entregado en ocasiones anteriores".[10]

Atendido el recurso, el 12 de octubre de 2023, el TPI emitió una *Orden de Mostrar Causa*,[11] en la cual, le concedió un término a la parte apelante para que comparecieran por escrito y mostraran causa por la cual no se debería expedir el recurso de *Mandamus*. Así las cosas, el 3 de noviembre de 2023, el Estado presentó una *Moción de Desestimación*.[12] Sostuvo que en esta controversia procedía la desestimación del pleito toda vez que el Registro Demográfico no incumplió con su deber ministerial, pues entregó la información solicitada. Además, agregó que no procedía la divulgación según solicitada por la parte apelada, ya que las bases de datos que se le proveyó se excluyó información confidencial inidentificable y únicamente compartieron los datos estadísticos. Así pues, el Estado manifestó que el TPI debía hacer un balance de intereses entre al

---

[9] Apéndice del recurso, a las págs. 81-82.
[10] Apéndice del recurso, a la pág. 27.
[11] Apéndice del recurso, a las págs. 83-84.
[12] Apéndice del recurso, a las págs. 85-110.

derecho al acceso de la información pública y la protección de los derechos fundamentales de terceros que se vería vulnerados si se compartiera cierta información sensitiva. Finalmente, justificó el no compartir los campos suprimidos por el mandato de algunas disposiciones de la *Ley del Registro General Demográfico de Puerto Rico* (*Ley del Registro Demográfico*),[13] algunas disposiciones de la *Ley de Datos Abiertos del Gobierno de Puerto Rico* (Ley de Datos Abiertos)[14] y la HIPAA.

Tras varios tramites procesales que son innecesarios pormenorizar, el foro primario señaló una vista de *Mandamus* y argumentativa, por lo que ordenó a las partes a realizar esfuerzos para estipular hechos y documentos, así como para que anunciaran cualquier prueba que se propusieran presentar en evidencia en la misma. En cumplimiento, las partes presentaron una moción conjunta con hechos y documentos estipulados. Del mismo modo, el CPI presentó un escrito para que se tomara conocimiento judicial de los documentos obrantes en ciertos expedientes judiciales,[15] mientras que el Estado informó la prueba documental y testifical que presentaría en la vista.[16]

Llegado el día de la vista, las partes estipularon ciertos documentos adicionales e informaron al foro primario que con los hechos y documentos estipulados daban por sometido el asunto fáctico, por lo que se hizo innecesaria la presentación de testigos.[17] En consecuencia, cada parte tuvo la oportunidad de argumentar ampliamente en torno a la *Petición* instada, así como a la solicitud de desestimación. En esta, las partes esbozaron sus respectivas teorías legales.[18] Conforme surge del Sistema Unificado de Manejo y

---

[13] Ley Núm. 24 de 22 de abril de 1931, 24 LPRA § 1041 *et seq.*
[14] Ley Núm. 122-2019, 3 LPRA § 9891 *et seq.*
[15] Apéndice del recurso, a la pág. 544.
[16] *Id.*
[17] Apéndice del recurso, a la pág. 544.
[18] Apéndice del recurso, a las págs. 373-378.

Administración de Casos (SUMAC), en el documento intitulado *Registro General de Evidencia Presentada,* se constató que, en la vista, la prueba admitida por parte del Estado fue la siguiente:

1. Lista de Renglones que contiene la base de datos de defunciones de Puerto Rico (entrada 15)
2. Captura de pantalla ilustrativa de la base de datos remitida el 5 de junio de 2023 (entrada 15)[19]

Por otra parte, la prueba admitida por parte del CPI fue la que sigue:

1. Petición Mandamus SJ2018CV0561 (entrada 14)
2. Sentencia SJ2018CV00561 (entrada 14)
3. Petición de Mandamus (entrada 14)
4. Sentencia Parcial SJ2019CV02706 (entrada 14)
5. Petición Mandamus (entrada 14)
6. Moción Informativa Conjunta SJ2020CV02641 (entrada 14)
7. Sentencia SJ2020CV02641 (entrada 14)
8. Petición Mandamus (entrada 14)
9. Minuta SJ2021CV05403 (entrada 14)
10. Sentencia SJ2021CV05403 (entrada 14)
11. Curriculum Vitae corto de la Dra. Cruz María Nazario (entrada 14)
12. Artículos publicados (entrada 14)
13. Artículos publicados (entrada 14)
14. Omaya Sosa Pascual y Jeniffer Wiscovitch, COVID-19: Exceso de cientos, etc. (entrada 14
15. Jeniffer Wiscovitch, Cambio "dramático" en el perfil de mortalidad, etc. (entrada 14)[20]

Finalmente, la prueba estipulada por ambas partes fue la siguiente:

1. Correo electrónico de Jeniffer Wiscovitch Padilla del 29 de agosto de 2022 (entrada 13)
2. Correo electrónico de Elizabeth Cruz González del 13 de septiembre de 2022 (entrada 13)
3. Correo electrónico de Jeniffer Wiscovitch Padilla del 3 de octubre de 2022 (entrada 13)
4. Correo electrónico de Elizabeth Cruz González del 13 de octubre de 2022 (entrada 13)
5. Correo electrónico de Jeniffer Wiscovitch Padilla del 31 de octubre de 2022 (entrada 13)
6. Correo electrónico de Elizabeth Cruz González del 8 de noviembre de 2022 (entrada 13)
7. Correo electrónico de Jeniffer Wiscovitch Padilla del 20 de enero de 2023 (entrada 13)
8. Correo electrónico de Wanda del C. Llovet Díaz del 20 de enero de 2023 (entrada 13)
9. Correo electrónico de Elizabeth Cruz González del 2 de febrero de 2023 (entrada 13)

---

[19] Véase SUMAC, a la entrada 21, en el documento intitulado *Registro General de Evidencia Presentada.*
[20] *Id.*

10. Correo electrónico de Omaya Sosa Pascual del 26 de mayo de 2023 (entrada 13)
11. Correo electrónico de Annabelle Ruiz Román del 5 de junio de 2023 (entrada 13)
12. Correo electrónico de Omaya Sosa Pascual del 7 de junio de 2023 (entrada 13)
13. Correo electrónico de Annabelle Ruiz Román del 14 de junio de 2023 (entrada 13)
14. Carta de Carlos Mellado López y Wanda del C. Llovet Díaz del 13 de junio de 2023 (entrada 13)[21]

Luego, el 7 de diciembre de 2023, el CPI presentó un *Memorando de Derecho y Oposición a Moción de Desestimación.*[22] En síntesis, argumentó que en la presente controversia procedía el auto de *Mandamus.* En lo pertinente, abordó que en este caso aplicaba la doctrina de cosa juzgada toda vez que, en al menos cinco (5) ocasiones anteriores, el TPI había abordado esta controversia entre las mismas partes y en todas se le terminó entregando la base de datos en cuestión de forma completa al CPI. Por otro lado, sostuvo que la *Ley del Registro Demográfico* no contenía lenguaje alguno referente a la confidencialidad de sus documentos y que en esta controversia no era aplicable la HIPAA ni la *Carta de Derechos y Responsabilidades del Paciente,*[23] ni la *Ley de Datos Abiertos.* Finalmente, concluyó su escrito con el fundamento de que el interés público de acceder a la información pública supera el interés de mantener dicha información confidencial.

Por su parte, el Estado presentó su *Réplica a Memorando de Derecho y Oposición a Moción de Desestimación.*[24] En ella, insistió en el planteamiento de que el acceso a los datos solicitados no procedía ya que era una intromisión injustificada de la intimidad de terceros. De la misma forma, rechazó la aplicación de la doctrina de cosa juzgada en el presente caso. Evaluado los argumentos presentados, el 8 de enero de 2024, el foro primario emitió la *Sentencia* apelada.[25]

---

[21] *Id.*
[22] Apéndice del recurso, a las págs. 389-445.
[23] Ley Núm. 194-2000, 24 LPRA § 3041 *et seq.*
[24] Apéndice del recurso, a las págs. 446-538.
[25] Apéndice del recurso, a las págs. 539-585.

En la *Sentencia,* el TPI declaró *Ha Lugar* el recurso de *Mandamus* presentado por el CPI y *No Ha Lugar* la solicitud de desestimación presentada por el Estado.[26] En consecuencia, ordenó al Estado a producir y/o brindar acceso a la información o documentos públicos existentes y bajo su custodia que fuesen responsivos a la solicitud de información presentada por el CPI en el término final de cinco (5) días laborables.

De igual forma, el foro primario (i) dispuso que el Estado debía cumplir con su deber ministerial de entregar la base de datos de defunciones actualizada del Registro Demográfico para los años 2022 y 2023 y hasta lo más reciente posible, en el formato Excel, tal y cual se le había notificado en años anteriores; (ii) ordenó al Estado a que prospectivamente, divulgara la información objeto de este caso cuando le fuese solicitada por el CPI, en los mismos términos ordenados en la *Sentencia* emitida, para cumplir con el Artículo 4 de la Ley 141-2019,[27] y la normativa aplicable; y (iii) expresó que aunque algunos de los datos crudos solicitados en este caso podrían considerarse sensitivos para algunas personas (aunque no fuesen confidenciales o privados en términos jurídicos), exhortó a cualquier medio de comunicación que recibiese la información a que tomara en cuenta las preocupaciones ciudadanas en cuanto a su manejo y/o posible publicación subsiguiente a tenor de los preceptos que rigen la profesión del periodismo en Puerto Rico.

Puntualizamos que, en la *Sentencia* apelada, el TPI incluyó una relación de los argumentos de las partes y de igual manera, enumeró una serie de hechos estipulados los cuales, para un cabal entendimiento, reseñaremos a continuación:

1) El Centro de Periodismo Investigativo, Inc. ("CPI"), es una corporación sin fines de lucro debidamente organizada bajo las leyes del Estado Libre Asociado

---

[26] Apéndice del recurso, a la pág. 584.

[27] *Ley de Transparencia y Procedimiento Expedito para el Acceso a la Información Pública,* Ley 141-2019, 3 LPRA § 9911, *et. seq.*

de Puerto Rico. Su Directora Ejecutiva es la periodista Sra. Carla Minet Santos Santiago ("señora Santos Santiago").

2) El CPI tiene como misión fomentar el derecho constitucional de acceso a la información en Puerto Rico por tres vías principales: el periodismo investigativo, la litigación y la formación periodística. Su página web es: http://periodismoinvestigativo.com/.

3) El Dr. Carlos Mellado López es el Secretario del Departamento de Salud de Puerto Rico. El Departamento de Salud existe en virtud de la Sección 6 del Artículo IV de la Constitución de Puerto Rico. CONST. PR, Art. IV sec. 6. Entre las responsabilidades delegadas, el Secretario de Salud "tendrá a su cargo todos los asuntos que por ley se encomienden relacionados con la salud, sanidad y beneficencia pública. . .". 3 LPRA sec. 171.

4) La Sra. Wanda del C. Llovet Díaz es la Directora del Registro Demográfico de Puerto Rico. El Registro Demográfico de Puerto Rico fue creado en virtud de la Ley Núm. 24 del 22 de abril de 1931, según enmendada, 24 LPRA secs. 1041-1302, está adscrito al Departamento de Salud del Estado Libre Asociado de Puerto Rico, y tiene a su cargo "el registro, colección, custodia, preservación, enmiendas y certificación de récords vitales; la colección de otros informes requeridos por esta parte; actividades relacionadas a ella, incluyendo la tabulación, análisis y publicación de estadísticas vitales". 24 LPRA sec. 1042.

5) El Estado Libre Asociado de Puerto Rico ("ELA"), es el ente jurídico gubernamental a nivel central, creado por la Constitución de Puerto Rico, y cuenta con capacidad para demandar y ser demandado. Se incluyó al ELA en el presente pleito en atención a que el Departamento de Salud y el Registro Demográfico de Puerto Rico no cuentan con personalidad jurídica separada del ELA.

6) Como parte de una investigación periodística que el CPI llevaba a cabo en torno a las muertes vinculadas al paso del huracán María por Puerto Rico, el 7 de febrero de 2018 el CPI presentó una petición de *mandamus* en contra de la Sra. Wanda Llovet Díaz, en su capacidad como Directora del Registro Demográfico de Puerto Rico y del Estado Libre Asociado y, entre otras cosas, solicitó copia de la base de datos sobre causas de muerte que mantiene

el Registro Demográfico de Puerto Rico, así como copia de todos los certificados de defunción emitidos en Puerto Rico desde el 18 de septiembre de 2017 hasta la fecha en que se ordenase su divulgación. (nota omitida)

7) En dicho pleito, los allí peticionados, Sra. Llovet Díaz y el ELA argumentaron, entre otras cosas, que la información era confidencial por identificar a la persona fallecida y a los informantes de la muerte. Asimismo, los allí peticionados alegaron que la información solicitada estaba protegida bajo el privilegio de información oficial por contener la data provista por un informante, médico, forense o funerario para que la agencia realizara estadísticas vitales confiables y que dicha información no se publicaba o utilizaba para otros fines que no fueran estadísticos.

8) El 4 de junio de 2018, se dictó una Sentencia y, entre varios asuntos, dispuso lo siguiente: ...este Tribunal determina que, en primer término, los certificados de defunción y la información adicional solicitada por los demandantes (nota omitida) son de naturaleza pública y, en segundo término, el Estado no tiene un interés apremiante para justificar negar el acceso a éstos.

Este Tribunal concluye que, con excepción de los números de seguro social, la información contenida en los certificados de defunción y la información adicional solicitada no es privilegiada. Por lo tanto, este Tribunal ordena que se permita el acceso a las partes demandantes a los certificados de defunción, por inclinarse la balanza a favor del derecho constitucional de acceso a la información.
...
...el Estado tenía que haber realizado un gran esfuerzo por lograr presentar prueba que demuestre la existencia de intereses de mayor jerarquía que los valores protegidos por el derecho de libertad de información. Por ello, examinadas con gran detalle todas las alegaciones de las partes, este Tribunal concluye que revelar la información solicitada por la parte demandante no resulta perjudicial a algún interés público o gubernamental, por el contrario, el Estado no esbozó razón alguna que justifique la secretividad de los documentos en cuestión. El permitir que se conozca la verdad contribuiría y allanaría el camino para el proceso de recuperación del gran dolor que ocasionó el huracán María a miles de familias puertorriqueñas. "[P]ermitir la secretividad gubernamental invita y propicia a la

arbitrariedad y a la indiferencia gubernamental." (nota omitida)

9) Con el acceso a la base de datos que proveyó el Estado en respuesta a la petición de mandamus de dicho pleito (*Centro de Periodismo Investigativo v. Llovet Díaz, et al.*, SJ2018CV00561 consolidado con *The Cable News Network, Inc.* v. *Llovet Díaz, et al.*, SJ2018CV00561), el CPI investigó la mortalidad causada por el huracán María. Su uso permitió identificar a las víctimas, conocer su realidad a través de entrevistas con sus familiares, y revelar en la investigación *Los muertos de María*, disponible en https://losmuertosdemaria.com/ (última visita el 16 de noviembre de 2023). (nota omitida)

10) Como parte de una investigación sobre las muertes violentas en Puerto Rico a manos de agentes del Negociado de la Policía, el 18 de marzo de 2019, la organización Kilómetro 0, Inc., presentó una acción de mandamus en contra del Sr. Héctor M. Pesquera López en su capacidad como Secretario del Departamento de Seguridad Pública de Puerto Rico, la Sra. Wanda Llovet Díaz en su capacidad de Directora del Registro Demográfico de Puerto Rico, el ELA, entre otros promovidos, con relación a los informes sobre el uso de fuerza por parte de los miembros del Negociado de la Policía. En lo aquí pertinente, en dicho caso Kilómetro 0 Inc. solicitó copia de los certificados de defunción de varias personas y copia de la base de datos sobre causas de muerte desde el 2014 al presente en formato procesable, sin datos ni cifras agrupadas. (nota omitida)

11) El 26 de abril de 2019 se dictó una Sentencia Parcial en la cual se acogió el aviso de desistimiento parcial de la reclamación en contra de la Sra. Wanda Llovet Díaz por el Registro Demográfico haber cumplido con la entrega del requerimiento de información. (nota omitida)

12) Como parte de una investigación en torno a las muertes vinculadas a la pandemia del COVID-19, el 28 de abril de 2020 el CPI presentó otra petición de mandamus en contra de la Sra. Wanda Llovet Díaz, en su capacidad oficial de Directora del Registro Demográfico de Puerto Rico, y del ELA en la que solicitó:

a. La base de datos de mortalidad en Puerto Rico para los años 2007 al 2020, inclusive, con todos sus campos, salvo los del número de seguro social, en formato reutilizable (CSV, XLS), así como su diccionario de datos, tal y como las partes

promovidas lo habían compartido como resultado del litigio en el caso *Centro de Periodismo Investigativo v. Llovet, et al.,* SJ2018CV00561, consolidado con SJ2018CV00843 (Sentencia del 4 de junio de 2018)...

b. Copia digital de los certificados de defunción emitidos desde el 1 de enero de 2020 hasta el presente, con todos sus campos, salvo los del número de seguro social, tal y como las partes promovidas lo habían compartido como resultado del litigio en el caso *Centro de Periodismo Investigativo v. Llovet, et al.*, SJ2018CV00561, consolidado con SJ2018CV00843 (Sentencia del 4 de junio de 2018)... (nota omitida)

13) Posteriormente, el 1 de junio de 2020 el CPI y las allí promovidas presentaron una moción conjunta para informar que se había logrado la entrega de toda la información solicitada, por lo que adujeron que se le ponía fin a la controversia. A su vez informaron que "para evitar controversias futuras sobre la solicitud y entrega de los documentos e información aquí solicitadas, las partes han acordado que el CPI canalizará sus solicitudes futuras a través de Michelle de la Cruz, Directora de la Oficina de Comunicaciones y Asuntos Públicos del Departamento de Salud, y la persona designada por la parte promovida para ese propósito".(nota omitida) Como resultado, el 2 de junio de 2020 se dictó una Sentencia de desistimiento con perjuicio. (nota omitida)

14) Con el acceso a la base de datos que proveyó el Estado el Estado en respuesta a dicha petición de mandamus (SJ2020CV02641), las periodistas Omaya Sosa Pascual y Jeniffer Wiscovitch del CPI publicaron el reportaje: *COVID-19: Exceso de cientos de muertes en Puerto Rico no ha sido investigado por el Gobierno* (septiembre de 2020) (disponible en https://periodismoinvestigativo.com/2020/09/covid-19-exceso-decientos-de-muertes-en-puerto-rico-no-ha-sido-investigado-por-el-gobierno/ (última visita el 16 de noviembre de 2023). (nota omitida)

15) Como parte de una investigación relacionada a la administración de las vacunas del COVID-19 en Puerto Rico, el 23 de agosto de 2021, el CPI presentó una nueva petición de mandamus contra las mismas partes aquí peticionadas (nota omitida) en el que solicitó la base de datos de mortalidad en Puerto Rico, esta vez para los años 2020 y 2021, hasta la fecha más reciente disponible. (nota omitida)

16) El 27 de agosto de 2021 se realizó una vista de mandamus en dicho caso (*Centro de Periodismo Investigativo, Inc. v. Mellado López et al.*, SJ2021CV05403) y entre varios asuntos, la parte peticionada argumentó "que el Departamento de Salud para salvaguardar la confidencialidad de la información en algunos documentos no brindó el nombre de las personas fallecidas, direcciones, el nombre del médico que certifica la muerta y el nombre del informante. Manifiesta que información no provista esa protegida por la Ley HIPAA". (nota omitida)

17) El 6 de octubre de 2021 se dictó Sentencia de desistimiento sin perjuicio dado que el CPI le informó al Tribunal que daba por cumplidas las peticiones de información "sin perjuicio de que pueda hacer preguntas de aclaración o solicitudes de información de seguimiento conforme los acuerdos alcanzados". (nota omitida)

18) Con el acceso a la base de datos que proveyó el Estado en respuesta a dicha petición de mandamus (*Centro de Periodismo Investigativo, Inc. v. Mellado López et al.*, SJ2021CV05403) la periodista Jeniffer Wiscovitch Padilla del CPI publicó el reportaje *Cambio "dramático" en el perfil de mortalidad por COVID-19 en Puerto Rico,* (9 de diciembre de 2021) (disponible en https://periodismoinvestigativo.com/2021/12/cambio-dramatico-perfil-mortalidadcovid-19-puerto-rico/) (última visita el 16 de noviembre de 2023). (nota omitida)

19) El 29 de agosto de 2022, la periodista Jeniffer Wiscovitch Padilla ("Wiscovitch Padilla), del CPI, envió un correo electrónico a la señora Llovet Díaz, Directora del Registro Demográfico, a la Sra. Lisdián Acevedo Román ("señora Acevedo Román"), Directora de Comunicaciones del Departamento de Salud, como representante del Dr. Mellado López, en el que solicitó "la base de datos de defunciones actualizada del Registro Demográfico para el año 2021 y 2022, y hasta lo más reciente disponible, en formato Excel, tal como se nos ha entregado en ocasiones anteriores". (nota omitida)

20) Luego de varias comunicaciones entre las partes, el 13 de septiembre de 2022, las partes peticionadas entregaron un disco compacto ("CD") con la información solicitada por el CPI. (nota omitida)

21) El 3 de octubre de 2022, la periodista Wiscovitch Padilla envió un correo electrónico a la señora Llovet Díaz y a la señora Acevedo Román en el que solicitó "los datos de la base de defunciones correspondientes al mes de septiembre y lo que va de octubre" de 2022. (nota omitida)

22) Luego de varias comunicaciones entre las partes, el 13 de octubre de 2022 las partes peticionadas entregaron un CD con la información solicitada por el CPI. (nota omitida)

23) El 31 de octubre de 2022, la periodista Wiscovitch Padilla envió un correo electrónico a la señora Llovet Díaz y a la señora Acevedo Román en el que solicitó "la base de datos de defunciones actualizada del Registro Demográfico para el año 2022, y hasta lo más reciente disponible, en formato Excel, tal como se nos ha entregado en ocasiones anteriores". (nota omitida)

24) El 8 de noviembre de 2022, las partes promovidas entregaron un CD con la información solicitada por el CPI. (nota omitida)

25) El 20 de enero de 2023, la periodista Wiscovitch Padilla envió un correo electrónico a la señora Llovet Díaz y a la señora Acevedo Román en el que solicitó "la base de datos de defunciones actualizada del Registro Demográfico para el año 2022, y hasta lo más reciente disponible, en formato Excel, tal como se nos ha entregado en ocasiones anteriores". (nota omitida)

26) Luego de un mensaje de respuesta de 20 de enero de 2023 de la señora Llovet Díaz, informando que la información sería compartida electrónicamente, el 2 de febrero de 2023 los datos completos fueron entregados en una tabla de Excel protegida por una contraseña enviada mediante correo electrónico. (nota omitida)

27) El 26 de mayo de 2023, la periodista Omaya Sosa Pascual ("Sosa Pascual") del CPI envió un correo electrónico a la señora Llovet Díaz y a la señora Acevedo Román en el que solicitó los datos de mortalidad actualizados y contenidos en la base de datos de defunciones para el 2022 y lo que va del 2023. (nota omitida)

28) El 5 de junio de 2023, las partes promovidas entregaron un disco compacto que alegadamente incluía la información solicitada por el CPI, pero con

varios campos de la base de datos suprimidos, como la información de los nombres, apellidos y direcciones de los difuntos e informantes. (nota omitida)

29) El disco compacto con la base de datos de muertes de los años 2022 y 2023 entregado el 5 de junio de 2023 incluyó los siguientes renglones de información: fecha de defunción, número de certificado, número de control, fecha de inscripción, género, edad, lugar de nacimiento, fecha de nacimiento, si fue veterano, código postal, municipio de fallecimiento, lugar (facilidad) de fallecimiento, tiempo en que estuvo en la facilidad antes de fallecer, estado marital, tipo de muerte, fecha de la declaración de muerte, fecha y hora en el que se declaró la muerte, si el cuerpo fue referido al Instituto de Ciencias Forenses, número de patología, si el cuerpo está pendiente de investigación, fecha de la certificación, si el fallecido fue donante de órganos, órganos donados, causa de muertes y sus descripciones, si al cuerpo se le realizó autopsia, si el tabaco está relacionado a la muerte, si la fallecida estaba en estado de embarazo, si la muerte fue natural o por accidente, educación, raza, ocupación y tipo de industria, tiempo en la ocupación, tipo de funeral, si el cuerpo fue embalsamado, fecha del funeral, funeraria y número de licencia del director funerario. (nota omitida)

30) La parte peticionada suprimió la entrega de 41 campos de información que no había suprimido en las entregas anteriores, siendo algunos de estos: nombre de la persona fallecida, segundo nombre, apellidos paterno y materno, direcciones, nombres del cónyuge, nombre del padre y de la madre, nombre y dirección del informante, nombre y dirección de la persona que certificó la muerte, nombre y licencia del embalsamador, numero de licencia de la funeraria, entre otros. (nota omitida)

31) El 7 de junio de 2023, la periodista Sosa Pascual envió un correo electrónico a las partes peticionadas, requiriendo la entrega de la base de datos completa, es decir, "con los campos que le fueron removidos". (nota omitida)

32) Tras varias gestiones de seguimiento, el 14 de junio de 2023, las partes peticionadas remitieron un correo electrónico a la señora Sosa Pascual en el que anejaron una carta, con fecha del día anterior, suscrita por el Dr. Mellado López. En la comunicación se invocaron las disposiciones de la

Ley HIPAA para proteger información personal identificable de la base de datos de defunciones. (nota omitida)

33) El 11 de octubre de 2023 el CPI presentó la acción de mandamus de epígrafe.[28]

Establecido lo anterior, en su dictamen, el foro primario destacó que no existía controversia en torno a que los certificados de defunción y la base de datos de donde estos surgían son documentos públicos. Expresó que la cuestión radicaba en torno a si los campos suprimidos por el Estado constituían información confidencial. En ese sentido, el TPI determinó la inaplicabilidad de la *Carta de Derechos y Responsabilidades del Paciente* y de la HIPAA en esta controversia. Asimismo, subrayó que en la *Ley del Registro Demográfico* no surgía lenguaje que clasificara sus documentos como confidenciales. De la misma forma, interpretó que la *Ley de Datos Abiertos* no establece una norma de confidencialidad para propósitos del derecho constitucional de acceso a información pública, sino que esta hacía referencia a una excepción al deber de divulgación rutinaria que tienen las entidades gubernamentales al cumplir con la política pública general para la digitalización de sus datos.

Por último, en cuanto al asunto de la alegada violación de derechos fundamentales a terceros, el TPI realizó el siguiente análisis:

Como ya mencionamos, la parte peticionada no cumplió con el peso probatorio para demostrar que la información solicitada en este caso esté cobijada por alguna norma de confidencialidad establecida de manera clara y terminante por la Asamblea Legislativa. Además, tampoco demostró que los terceros (familiares de las personas fallecidas y los informantes) posean una expectativa razonable de intimidad, ya sea en términos subjetivos como objetivos, que amerite impedir su divulgación a la parte peticionaria. Aun cuando entendemos que algunos de los datos crudos de los solicitados en el presente caso pudieran considerarse sensitivos para algunas personas y que sería razonable

---

[28] Apéndice del recurso, a las págs. 551-558.

que cualquier medio de comunicación tome en consideración las preocupaciones ciudadanas en cuanto a su manejo o posible publicación, ello no justifica que se deniegue el reclamo constitucional de acceso a información pública ni tampoco a que se emita una orden de censura previa a tales fines.

Por último, y aun si se considerara que la información solicitada en este caso sí está albergada por alguna expectativa razonable de intimidad, somos del criterio – al igual que lo resolvió este Tribunal en un caso entre las mismas partes hace más de cinco años, *Centro de Periodismo Investigativo v. Llovet Díaz, et al.*, SJ2018CV00561, y varios tribunales estatales ante controversias similares– que en el balance de los derechos constitucionales involucrados procede su divulgación. La parte peticionada sostuvo que dicha conclusión se podía justificar en aquel momento histórico debido a que la información se solicitaba para examinar los señalamientos en torno a las muertes asociadas al paso de los huracanes Irma y María; pero que, a su entender, no existen intereses similares al presente que justifiquen el acceso a la base de datos del registro de defunciones.(nota omitida) No obstante, surge del expediente que la solicitud objeto del presente litigio está enmarcada en el interés de la parte peticionaria en investigar asuntos de interés público sobre la mortalidad, específicamente sobre "la inesperada alza significativa en la mortalidad en Puerto Rico durante el 2022 y 2023. La eliminación de información vital para entender estas muertes de impide a las periodistas dar curso a dicho trabajo investigativo". Además, destacó el anuncio reciente del Departamento de Salud en cuanto a una epidemia de influenza. *Entradas núm. 1 y 24 del expediente electrónico*, pág. 29. En ese sentido, somos del criterio que el derecho constitucional de acceso a información pública, el cual dimana de la libertad de expresión, prevalece –en el balance constitucional correspondiente– sobre el reclamo de intimidad de terceros levantado por la parte peticionada en el presente caso.

Para concluir, disponemos que procede la divulgación de la información solicitada por la parte peticionaria en el presente caso. Ello, toda vez que la documentación requerida evidentemente es pública y la parte peticionada no descargó su responsabilidad probatoria para demostrar la aplicabilidad en este caso de alguna de las excepciones reconocidas en el derecho constitucional de acceso a información pública, como lo sería un reclamo de confidencialidad y/o un interés apremiante sobre ésta. (nota omitida) Ante ello, procede expedir un mandamus para hacer cumplir el derecho de acceso a información pública de la parte peticionaria.[29]

---

[29] Apéndice del recurso, a las págs. 583-584.

Insatisfecho con el resultado, el 17 de enero de 2024, el Estado presentó una *Moción de Reconsideración.*[30] En esta, recalcó el planteamiento en torno a la aplicación de la HIPAA en el presente caso y a que el foro primario erró al no proteger la información identificable para proteger el derecho de terceros y de los fallecidos. El 18 de enero de 2024, el TPI emitió y notificó una *Resolución* en la cual determinó *No Ha Lugar* la reconsideración.[31]

Inconforme, el 1 de febrero de 2024, compareció ante nos el Estado mediante un recurso de *Apelación* en el cual esgrimió los siguientes dos (2) errores:

Primer Error:

Erró el Tribunal de Primera Instancia al ordenar la divulgación **total** de la base de datos sobre los certificados de defunción para los años 2022 y 2023 sin eliminar los cuarenta y un campos identificados con información personal y sensitiva de las personas fallecidas y sus informantes, a pesar de que existe una expectativa razonable de intimidad sobre dicha información, como bien ha reconocido nuestro Tribunal Supremo local en controversias similares.

Segundo Error:

Erró el Tribunal de Primera Instancia al ordenar la producción de la base de datos al CPI prospectivamente, aun cuando dicha orden violenta el principio constitucional de justiciabilidad.

Junto al recurso de *Apelación*, el Estado presentó, además, una *Urgente Solicitud en Auxilio de Jurisdicción.* Examinada la misma, mediante *Resolución* emitida el 2 de febrero de 2024, este Tribunal declaró *Ha Lugar* la solicitud en auxilio de jurisdicción y ordenó la paralización de los procedimientos ante el foro primario.

Tras haberle concedido una breve prórroga para comparecer, el 6 de marzo de 2024, la parte apelada presentó su *Alegato en Oposición del Centro de Periodismo Investigativo.* Con el beneficio de

---

[30] Apéndice del recurso, a las págs. 586-595.
[31] Apéndice del recurso, a las págs. 602-603.

la comparecencia de ambas partes procederemos a disponer del recurso ante nuestra consideración.

II

## A. Apelación Civil

La Regla 52.2 (a) de las Reglas de Procedimiento Civil,[32] dispone que los recursos de apelación tienen que presentarse dentro de un término jurisdiccional de treinta (30) días desde el archivo en autos de copia de la notificación de la sentencia recurrida. Como es conocido, un plazo jurisdiccional es de carácter fatal. Ello quiere decir que no admite justa causa, es improrrogable, y que su incumplimiento es insubsanable.[33] La correcta notificación de una sentencia es una característica imprescindible del debido proceso judicial.[34] Como corolario de lo anterior, la Regla 13(A) del Reglamento de este Tribunal establece que:

> Las apelaciones contra sentencias dictadas en casos civiles por el Tribunal de Primera Instancia, se presentarán dentro del término jurisdiccional de treinta días contados desde el archivo en autos de una copia de la notificación de la sentencia.
> [...]

No obstante, el término de treinta (30) días para acudir en alzada puede quedar interrumpido mediante la presentación oportuna de una moción de reconsideración fundamentada.[35] En tal caso, el curso del término para apelar comienza a partir del archivo en autos copia de la notificación de la resolución que resuelve la moción.[36] Esto, a pesar de que se haya declarado la moción No Ha Lugar.

---

[32] 32 LPRA Ap. V, R. 52.2 (a).
[33] *Martínez, Inc. v. Abijoe Realty Corp.*, 151 DPR 1, 7 (2000); *Arriaga v. FSE*, 145 DPR 122, 131 (1998).
[34] *Rodríguez Mora v. García Lloréns*, 147 DPR 305, 309 (1998).
[35] 32 LPRA Ap. V, R. 47.
[36] *Id.*

## B. Mandamus

El Código de Enjuiciamiento Civil de Puerto Rico define el auto de *mandamus* como uno altamente privilegiado dictado por el Tribunal Supremo de Puerto Rico, o por el Tribunal de Primera Instancia, a nombre del Gobierno de Puerto Rico, y dirigido a alguna persona natural, a una corporación o a un tribunal judicial de inferior categoría dentro de su jurisdicción requiriéndoles para el cumplimiento de algún acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes.[37] Así, el auto de *mandamus* no confiere nueva autoridad y la parte a quien obliga deberá tener la facultad de poder cumplirlo.[38]

De igual modo, el auto de *mandamus* sólo procede para exigir el cumplimiento de un deber impuesto por la ley; es decir, un deber calificado de "ministerial" y que, como tal, no admite discreción en su ejercicio, sino que es mandatorio e imperativo.[39] El deber ministerial que exige el *mandamus* debe emanar de un empleo, cargo o función pública, por lo que el recurso procede contra todos los funcionarios del ejecutivo.[40] Es decir, "no se trata de una directriz o una disposición que permite hacer algo, sino de un mandato específico que la parte demandada no tiene opción para desobedecer".[41] Ahora bien, si el acto en cuestión depende de la discreción o juicio de un funcionario, tal deber se considera como no ministerial.[42]

Para que se logre expedir un auto de *mandamus*, es necesario que exista la constancia de un deber claramente definido que deba ser ejecutado.[43] Además, por tratase de un recurso altamente privilegiado, su expedición no se invoca como cuestión de derecho,

---

[37] 32 LPRA sec. 3421, Art. 649.
[38] *Id.*
[39] *AMPR v. Srio. Educación, ELA*, 178 DPR 253, 263 (2010).
[40] *Noriega v. Hernández Colón*, 135 DPR 406, 448 (1994).
[41] *Carrasquillo Román v. Inst. Correccional*, 204 DPR 699, 713 (2020).
[42] *Romero, Valentín v. Cruz, CEE et al.*, 205 DPR 972, 985 (2020).
[43] *AMPR v. Srio. Educación, ELA*, supra, a las págs. 263-264.

sino que descansa en la sana discreción del tribunal.[44] Sin embargo, la procedencia del *mandamus* depende inexorablemente del carácter del acto que se pretende compeler mediante dicho recurso.[45] En tal sentido, este recurso extraordinario "sólo procede para ordenar el cumplimiento de un deber ministerial, que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir ese remedio".[46] Asimismo, la jurisprudencia ha discutido que para que proceda un recurso de *mandamus* es necesario lo siguiente:

> que el peticionario le haya hecho un requerimiento previo al demandado para que éste cumpla con el deber que se le exige, debiendo alegarse en la petición, tanto el requerimiento como la negativa, o la omisión del funcionario en darle curso. Sólo se exime de este requisito: 1) cuando aparece que el requerimiento hubiese sido inútil e infructuoso, pues hubiese sido denegado si se hubiera hecho; ó 2) cuando el deber que se pretende exigir es uno de carácter público; a diferencia de uno de naturaleza particular que afecta solamente el derecho del peticionario".[47]

## C. Regla 10.2 de las Reglas de Procedimiento Civil

La Regla 10.2 de las Reglas de Procedimiento Civil regula la presentación de defensas y objeciones a una reclamación judicial.[48] La moción de desestimación al amparo de esta regla es una defensa especial que formula el demandado en la que solicita que se desestime la demanda presentada en su contra, aun sin necesidad de formular una alegación previa.[49]

La regla establece que:

> Toda defensa de hechos o de derecho contra una reclamación se expondrá en la alegación responsiva excepto que, a opción de la parte que alega, las siguientes defensas pueden hacerse mediante una moción debidamente fundamentada:
> (1) falta de jurisdicción sobre la materia;
> (2) falta de jurisdicción sobre la persona;
> (3) insuficiencia del emplazamiento;
> (4) insuficiencia del diligenciamiento del emplazamiento;

---

[44] *Id.,* a la pág. 266.
[45] *Acevedo Vila v. Aponte Hernández,* 168 DPR 443, 455 (2006).
[46] *Id.*, a las págs. 454-455.
[47] *Noriega v. Hernández Colon,* 135 DPR 406, 448-449 (1994).
[48] 32 LPRA Ap. V, R. 10.2.
[49] *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409, 428 (2008); *Colón v. Lotería,* 167 DPR 625, 649 (2006).

(5) dejar de exponer una reclamación que justifique la concesión de un remedio;
(6) dejar de acumular una parte indispensable.[50]

El tribunal interpretará las alegaciones de la demanda conjuntamente, de forma liberal y de la manera más favorable posible a la parte demandante para determinar si la misma es suficiente para constituir una reclamación válida.[51] No obstante, procederá la desestimación cuando existan circunstancias que permitan a los tribunales determinar, sin ambigüedades, que la demanda carece de todo mérito o que la parte demandante no tiene derecho a obtener algún remedio.[52]

Por su parte, los tribunales deben evaluar el posible impacto que éste pueda tener sobre los intereses públicos involucrados; evitar una intromisión indebida en los procedimientos del poder ejecutivo, y que el auto no se preste a confusión o perjuicio de los derechos de terceros.[53]

### D. Health Insurance Portability and Accountability Act of 1996

En 1996 entró en vigor la *Health Insurance Portability and Accountability Act of 1996* (HIPAA), como un intento para mejorar la cobertura de seguros de salud en los mercados grupales e individuales, mejorar el servicio de atención a largo plazo, evitar el fraude y los abusos en las aseguradoras entre otros fines.[54] Al momento de su aprobación, la sec. 264 de esta legislación delegó al Secretario de Salud del Gobierno federal la encomienda de elaborar unas recomendaciones detalladas sobre los estándares que se deben aplicar en cuanto a la privacidad de información de salud individualmente identificable.[55]

---

[50] 32 LPRA Ap. V, R. 10.2.
[51] *Torres, Torres v. Torres et al.*, 179 DPR 481, 501 (2010); *Pressure Vessels PR v. Empire Gas PR*, 137 DPR 497, 505 (1994).
[52] *González Méndez v. Acción Social et al.*, 196 DPR 213, 235 (2016).
[53] *AMPR v. Srio. Educacion, E.L.A.,* supra, a la pág. 268.
[54] Véase, *Health Insurance Portability and Accountability Act of 1996*, Ley Pública Núm. 191 de 21 de Agosto de 1996 (110 Stat 1936).
[55] *Id.*, a la sec. 264.

Así fue como el Departamento de Salud federal promulgó las denominadas *Standards for the Privacy of Individually Identifiable Human Information* (*Privacy Rule*). Entre las disposiciones contenida en estas reglas, se destaca la regulación concerniente a información de salud protegida.[56] Es decir, aquellos datos relacionados a la salud de los individuos, la cual incluye información demográficos de un que han sido creados por ciertas entidades del cuidado de la salud la cual contiene, entre otras cosas, información referente a la salud física y mental de la persona entre otros datos.[57]

Ahora bien, las entidades cubiertas o *cover entity* a las cuales les aplica las disposiciones del *Privacy Rule* son:

(1) A health plan.
(2) A health care clearinghouse.
(3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.[58]

No obstante, pese a que esta regulación exige la protección de ciertos datos relacionados a la salud de los ciudadanos, el *Privacy Rule* no es una reglamentación exhaustiva, pues únicamente aplica a los *cover entity*.[59] Es decir, únicamente aplica a un número limitado de personas y organizaciones que poseen información

---

[56] Véase, 45 CFR § 164.502
[57] 45 CFR § 160.103. El texto original lee de la siguiente manera:

Individually identifiable health information is information that is a subset of health information, including demographic information collected from an individual, and:
(1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and
(i) That identifies the individual; or
(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

[58] 45 CFR § 164.104.
[59] A modo de referencia véase, J.L. Pritts *Altered States: State Health Privacy Laws and The Impact of The Federal Health Privacy Rule*, 2 Yale J. Health Pol'y, L. & Ethics, 327, 340-345 (2002) donde se discute el impacto de la ley federal de protección de la privacidad de datos de salud versus los estatutos estatales que atienden el mismo tema.

relacionada a la salud. Ello, tiene la consecuencia de que otras tantas entidades quedan desreguladas, al menos a nivel federal.[60]

**E. Ley de Transparencia y Procedimiento Expedito para el Acceso a la Información Pública, Ley 141-2019**

La Ley Núm. 141-2019, cumple con propósitos similares a la ley federal conocida como *Freedom of Information Act* (en adelante, FOIA)[61]. En ese sentido, ni FOIA ni la Ley Núm. 141-2019 obligan al Gobierno a crear documentos a la medida, que respondan a una petición en particular ni a brindar información abstracta, sino a los documentos que físicamente obran en las agencias.[62] A tales efectos, en la esfera federal, se descarta el uso de los procedimientos de acceso a la información pública establecidos en FIOA como mecanismos alternos de descubrimiento de prueba.[63]

El Artículo 3 de la Ley Núm. 141-2019, establece como política pública del Gobierno de Puerto Rico lo siguiente:

1) La información y documentación que produce el gobierno se presume pública y accesible a todas las personas por igual.
2) La información y documentación que produce el gobierno en sus estudios, transacciones y en el ejercicio de la autoridad pública, de manera directa o delegada, son patrimonio y memoria del pueblo de Puerto Rico.
3) El derecho constitucional de acceso a la información requiere la transparencia gubernamental.
4) Toda información o documento que se origine, conserve o reciba en cualquier dependencia del Gobierno, aunque se encuentre bajo la custodia de

---

[60] Existen varios casos en distintas jurisdicciones estatales en Estados Unidos que no consideran a ciertas agencias gubernamentales como *covered entity* bajo HIPAA. A modo de referencia, véase, *State v. Downs,* 923 So.2d 726, 731 (La.Ct.App.2005), donde se resolvió que un abogado de distrito no es un *covered entity* bajo HIPAA; *Beard v. City of Chicago,* 2005 (N.D.Ill. Jan.10, 2005), donde se resolvió que el Departamento de Bomberos de una ciudad no es un *covered entity* bajo HIPAA; *United States v. Mathis,* 377 F.Supp.2d 640, 645 (M.D.Tenn.2005) donde se resolvió que las agencias de orden público (*law enforcement agency*) no son *covered entity* bajo HIPAA; *U.S. v. Yazzie,* 998 F.Supp.2d 1044, 1116 (D.N.M., 2014) donde se resolvió que el FBI no es un *covered entity* bajo HIPAA y *Fox v. City of Alexandria,* 971 So.2d 468, 470, 2007-810, 3 (La.App. 3 Cir.,2007) donde se resolvió que una ciudad no es un *covered entity* bajo HIPAA.
[61] 5 USCA § 552 *et seq.*
[62] *US Department of Justice v. Tax Analysts,* 492 US 136, 145-46 (1989). *Forsham v. Harris,* 445 US 169, 185 (1980).
[63] *N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 US 214, 242 (1978).

un tercero, se presume público y debe estar accesible al Pueblo y la prensa.

5) El derecho de acceso a la información pública es un pilar constitucional y un derecho humano fundamental.

6) El acceso a la documentación e información pública tiene que ser ágil, económico y expedito.

7) Toda persona tiene derecho a obtener la información y documentación pública, sujeto a las normas y excepciones aplicables.

8) El Gobierno de Puerto Rico establece en la presente Ley una política de apertura a la información y documentación, que incluya la disponibilidad de la tecnología y de los avances necesarios para hacer valer el derecho de los solicitantes a acceder a la información y documentación pública de forma oportuna, objetiva, veraz, completa, reutilizable, procesable y disponible en formatos accesibles, inalterados e íntegros.[64]

El Artículo 6 de la referida ley, dispone: "Cualquier persona podrá solicitar información pública mediante solicitud escrita o por vía electrónica, sin necesidad de acreditar algún interés particular o jurídico...".[65]

El Artículo 7 de la Ley Núm. 141-2019, expone sobre la disponibilidad de información pública: "Toda decisión de denegar la divulgación de información pública tiene que especificar por escrito los fundamentos jurídicos en los que se basa la denegatoria o negativa de entregarla en el término establecido". [66]

Ahora bien, cuando la información solicitada haya sido negada por alguna entidad gubernamental, el Artículo 9 de la ley permite a los ciudadanos presentar un Recurso Especial de Revisión Judicial. En específico, el referido artículo dispone:

> Cualquier persona a la cual una entidad gubernamental le haya notificado su determinación de no entregar la información solicitada o que no haya hecho entrega de la información dentro del término establecido o su prórroga, tendrá derecho a presentar, por derecho propio o a través de su representación legal, ante la sala del Tribunal de Primera Instancia de la Región Judicial

---

[64] 3 LPRA § 9913.
[65] 3 LPRA § 9916.
[66] 3 LPRA § 9917.

de San Juan, un Recurso Especial de Acceso a Información Pública.[67]

Cónsono con lo anterior, la cláusula de interpretación de la ley, en su Artículo 12, lee como sigue: "Esta Ley deberá interpretarse en la forma más liberal y beneficiosa para la persona solicitante de información pública".[68]

Por último, cabe destacar que esta ley aplica a las tres (3) ramas del Gobierno, incluyendo las entidades gubernamentales, corporaciones públicas y los municipios.[69]

### F. Ley de Datos Abiertos del Gobierno de Puerto Rico, Ley 122-2019

En el 2019 se aprobó *Ley de Datos Abiertos del Gobierno de Puerto Rico* (*Ley de Datos Abiertos*).[70] Esta legislación se aprobó con el propósito de incorporar tendencias innovadoras en el manejo de datos para el beneficio de los ciudadanos. Así, en su Art. 4, se decretó como política pública del Gobierno lo que sigue:

> [S]e establece como Política Pública del Gobierno de Puerto Rico que el manejo efectivo de datos gubernamentales es esencial para apoyar los procesos de innovación de todos los sectores en Puerto Rico, el facilitar una cultura de mejoramiento continuo y de rendición de cuentas en el organismo gubernamental, el desarrollo y crecimiento económico sostenible, y el generar resultados tangibles, de valor y de impacto a nuestros ciudadanos.[71]

Del mismo modo, la *Ley de Datos Abiertos* dispone que todo reclamo de confidencialidad que haga cualquier Organismo Gubernamental para proteger o evitar la divulgación de un dato deberá realizarse conforme a estos criterios:

a. que una ley así lo dispone;
b. que el dato está protegido por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos;
c. que revelar el dato puede lesionar derechos fundamentales de terceros;
d. que se trate de la identidad de un confidente; o

---

[67] 3 LPRA § 9919.
[68] 3 LPRA § 9922.
[69] 3 LPRA § 9912.
[70] Ley Núm. 122-2019, 3 LPRA § 9891 *et seq.*
[71] 3 LPRA § 9894

e. que sea "información oficial", conforme a la Regla 514 de las Reglas de Evidencia de Puerto Rico.[72]

Del mismo modo, esta legislación incorpora excepciones adicionales a la hora de divulgar datos públicos las cuales se enumeran a continuación:

i. Toda información y/o documentación que sea clasificada como de seguridad nacional;

ii. Reglas o prácticas de personal internas de un Organismo Gubernamental;

iii. Comunicaciones internas entre dependencias;

iv. Información pública que aplique alguno de los privilegios reconocidos en la Constitución de los Estados Unidos o de Puerto Rico, leyes y Reglas de Evidencia, incluyendo la Información Oficial e Información Oficial-Decisional en Procedimientos Deliberativos sobre Política Pública, según reconocido por la jurisprudencia;

v. Información asociada a litigios civiles o criminales en los que un Organismo Gubernamental sea parte o empleado o funcionario público que por razón de su empleo sea parte, siempre que el litigio esté pendiente a la fecha de la solicitud o se encuentren en el proceso de investigación;

vi. Información que si fuera divulgada podría invadir la privacidad de un tercero o lesionar sus derechos fundamentales;

vii. Información sobre confidentes o encubiertos; investigaciones y/o procesamiento que incida en que a un ciudadano se le prive de un juicio justo e imparcial, o información que ponga en peligro la seguridad física de cualquier Persona;

viii. Sumario del ministerio público, el cual es privilegiado, o el (work product) que obre en el expediente investigativo, o que contenga información y/o documentación relacionada a una investigación en curso;

ix. Información sobre secretos de negocios obtenidos por una Persona, que es confidencial por contrato, estatuto o decisión judicial;

x. Información comercial o financiera para la que se demuestre que la divulgación causaría un daño competitivo sustancial a la persona de la que se obtuvo la información;

xi. Todo tipo de información relacionada a la dirección física, número de teléfono, información de contacto de emergencia, número de seguro social, número de tarjeta de crédito, información contributiva y/o financiera, actividad bancaria, información

---

[72] *Id.*

confidencial de terceros privados, secretos de negocio, planillas contributivas, débito o número de acceso que sea recopilada o mantenida por el Organismo Gubernamental; e

xii.    Información relacionada con la seguridad de la red informática o con su diseño, operación o defensa de dicha red informática.[73]

De igual manera, esta ley le impone a todo el Organismo Gubernamental el deber de digitalizar una serie de documentos enumerados en el estatuto. Además, delega al *Puerto Rico Innovation and Technology Service* (PRITS) la tarea de implementar la política pública promulgada por esta ley y crea los puestos de Principal Oficial de Datos y Oficiales de Datos.

## G. Carta de Derechos y Responsabilidades del Paciente

Con el fin de cumplir con el objetivo de que todos los ciudadanos tengan acceso adecuado a servicios y facilidades de salud médico hospitalarias de calidad, se promulgó la *Carta de Derechos y Responsabilidades del Paciente.*[74] Conforme reza la exposición de motivos de este estatuto:

> La promulgación de esta Ley contribuirá visiblemente a la formación de un público mejor informado, más consciente, más responsable y seguramente más saludable, lo cual tendrá el efecto de promover una utilización más eficiente de los recursos disponibles en esta importante área y redundará a largo plazo en considerable provecho para el pueblo de Puerto Rico. Se trata, a fin de cuentas, de un componente adicional en la reforma de salud y de una herramienta más en la búsqueda constante de alternativas y soluciones a los problemas de salud de nuestro pueblo, sobre todo del sector menos aventajado económicamente.[75]

Entre las disposiciones contenidas en esta ley, se destaca lo concerniente a la confidencialidad de información y récord médicos. Así en su Art. 11, se establece que:

> Todo paciente, tutor, usuario o consumidor de servicios de salud médico-hospitalarios en Puerto Rico tiene derecho a:

---

[73] *Id.*
[74] Ley Núm. 194-2000, 24 LPRA § 3041 *et seq.*
[75] Véase la *Exposición de Motivos* de la Ley Núm. 194-2000.

(a) Comunicarse libremente, sin temor y en estricta confidencialidad con sus proveedores de servicios de salud médico-hospitalarios.

(b) Tener plena confianza en que su información médica y de salud será mantenida en estricta confidencialidad por sus proveedores de servicios de salud médico-hospitalarios y no será divulgada sin la autorización escrita del paciente o de su tutor, y en todo caso únicamente para fines médicos o de tratamiento, incluyendo la continuación o modificación del cuidado médico o tratamiento o con fines de prevención, control de calidad o relacionados con el pago de servicios de salud médico-hospitalarios.

(c) Tener la confianza de que la divulgación no autorizada de información contenida en récords médicos o de salud se hará únicamente por orden judicial previa o mediante autorización específica de ley, incluyendo, pero sin limitarse a, para fines de investigaciones relacionadas con la perpetración de fraudes o la comisión de delitos.

(d) Todo proveedor y toda entidad aseguradora deberán mantener la confidencialidad de aquellos expedientes, récord clínico o documentos que contengan información sobre el estado médico de un paciente. Todo proveedor y toda entidad aseguradora deberán también tomar medidas para proteger la intimidad de sus pacientes, salvaguardando su identidad. Nada de lo dispuesto en esta Ley se tendrá como impedimento para fines del intercambio de información entre los proveedores de servicios de salud y la Administración de Servicios de Salud cuando la información provista sea pertinente para fines de auditoría y pago de servicios. El beneficiario acepta la facultad de ASES para iniciar gestiones de cobro y recobro de primas.[76]

[...]

Este estatuto aplica a todas las facilidades y servicios de salud médico-hospitalarios, profesionales de la salud, aseguradores y planes de cuidado de salud en toda la jurisdicción del Estado Libre Asociado de Puerto Rico.[77] Igualmente aplica a todos los usuarios y consumidores de tales servicios y facilidades en Puerto Rico.[78]

---

[76] 24 LPRA § 3049.
[77] 24 LPRA § 3041 nota.
[78] *Id.*

## H. El Registro Demográfico de Puerto Rico

En nuestra jurisdicción los hechos y los actos jurídicos relacionados al estado civil de las personas naturales se harán constar en el Registro Demográfico de Puerto Rico.[79] Dicho registro será la entidad encargada en conservar y realizar el acopio oficial de la información que expone y valida los datos demográficos de la sociedad puertorriqueña.[80] De esta forma, el Registro Demográfico de Puerto Rico fue creado por virtud de la *Ley del Registro Demográfico de Puerto Rico*.[81] Esta ley define al Registro Demográfico como una entidad adscrita Departamento de Salud de Puerto Rico y tiene a su cargo el registro, colección, custodia, preservación y enmiendas de récords vitales entre otras tareas a fines.[82] Además, el Registro Demográfico tiene a su cargo todo lo relacionado con la inscripción de los nacimientos, casamientos y defunciones que ocurran o se celebren en Puerto Rico.[83]

En cuanto a los certificados de defunción, el estatuto establece que debe inscribirse la defunción de un cadáver en el registro del lugar donde este falleció o en el lugar donde se haya encontrado el cuerpo.[84] Con este certificado entonces se podrá inscribir el fallecimiento.[85] Asimismo, los certificados de defunción contendrán los siguientes datos para fines legales, sociales y sanitarios:

> (1) Lugar de la defunción, que incluirá, si la muerte ha ocurrido en la zona urbana, la calle y número de la casa; si en un suburbio o barriada, el nombre del mismo, calle y número; si en un hospital o cualquier otra institución, el nombre de la misma debe darse en lugar del nombre de la calle y el número de la casa; si en la zona rural, el nombre del barrio.
> (2) Nombre y apellidos del fallecido.

---

[79] Véase, Código Civil de Puerto Rico de 2020, Ley 55-2020, 31 L.P.R.A. § 7631, Art. 681.
[80] *Id.*
[81] Ley Núm. 24 de 22 de abril de 1931, 24 LPRA § 1041 *et seq.*
[82] 24 LPRA. § 1042.
[83] 24 LPRA. § 1071.
[84] 24 LPRA § 1101.
[85] *Id.*

(3) Residencia del fallecido, que será el sitio donde residía permanentemente, expresando la población, nombre de la calle y número de la casa, si en la zona urbana, y la población y el nombre del barrio si en la zona rural.

(4) Tiempo de residencia en el municipio donde ocurrió la defunción.

(5) Si es extranjero, tiempo de residencia en Puerto Rico.

(6) Sexo.

(7) Color o raza.

(8) Estado civil, expresando si el fallecido era soltero, casado, viudo o divorciado y en los tres últimos casos, el nombre del cónyuge superviviente o premuerto.

(9) Fecha del nacimiento, la que constará del año, mes y día.

(10) Edad en años, meses y días. Si menor de un día, en horas y minutos.

(11) Ocupación. La ocupación debe informarse, si está trabajando en ocupación remunerada, con la siguiente información: (a) Oficio, profesión u ocupación, o clase especial de trabajo; (b) naturaleza general de la industria, negocio o establecimiento en el cual era empleado o patrono; (c) fecha en que trabajó por última vez en dicha ocupación, y (d) años que ha trabajado en la misma.

(12) Sitio del nacimiento; nombre del municipio, si es natural de Puerto Rico y el nombre del estado o país, si es extranjero.

(13) Nombre del padre.

(14) Lugar del nacimiento del padre; el nombre del municipio, si es natural de Puerto Rico [o] el nombre del estado o país, si es extranjero.

(15) Nombre y apellidos propios de la madre.

(16) Lugar del nacimiento de la madre; el nombre del municipio, si es natural de Puerto Rico [o] el nombre del estado o país, si es extranjero.

(17) Firma y dirección del declarante de la defunción.

(18) Cementerio donde ha de ser enterrado o sitio donde ha de ser trasladado el cadáver y fecha de la inhumación o traslado.

(19) Nombre y dirección del agente funerario o encargado del entierro

(20) Firma oficial del encargado del registro y fecha en que se efectuó la inscripción.

(21) Fecha de la defunción, la que constará del día, mes y año.

(22) Certificación sobre asistencia médica prestada al fallecido; cuándo tuvo lugar la defunción; última vez que se le vio vivo; la causa de muerte y también la causa contribuyente o secundaria si la ha habido; duración de cada una de ellas y si se atribuye a condiciones peligrosas o malsanas del empleo; firma y dirección del médico o funcionario que expide la certificación médica. En casos de muerte violenta se expresará si ésta ocurrió por accidente, suicidio u homicidio, fecha y sitio donde éste ocurrió y el instrumento, arma, máquina u objeto que infirió la lesión que causó la muerte. Se especificará, también, el nombre y fecha de la operación quirúrgica, si ha habido alguna, el motivo que la requirió y el órgano o parte del cuerpo afectada, así como el análisis de laboratorio que confirmó el diagnóstico, en caso de que se hubiere hecho alguno durante el curso de la

enfermedad del fallecido. Asimismo, deberá expresarse si se verificó autopsia. Las circunstancias personales y los datos estadísticos (números 1 al 16) serán autenticados por la firma del informante quien podrá ser cualquiera persona que tenga conocimiento de los hechos, de acuerdo con lo dispuesto en el Artículo 7 de esta Ley.[86]

Ahora bien, si se interesa obtener una copia certificada de este u otros documentos del Registro Demográfico, la Ley provee un procedimiento para ello.[87] De igual modo, el Art. 689 del Código Civil dispone lo concerniente a las personas legitimadas para solicitar la certificación de la constancia inscrita.[88] Así el mencionado artículo reza:

Están legitimados para solicitar la certificación de las actas obrantes en el Registro Demográfico las personas siguientes:

(a) las personas legitimadas a las que se refiere o afecta la inscripción según establecido en este Código, el menor de edad a través de sus progenitores con patria potestad y el incapaz a través de su tutor o representante legal;

(b) los causahabientes del inscrito, si es necesario para reclamar un derecho o una facultad que surge de su persona; y para acreditar su propio estado civil o impugnarlo;

(c) cualquier persona con legítimo interés, previa autorización judicial; (d) el ministerio público y el Secretario de Salud, si ello es necesario para cumplir sus facultades ministeriales;

(e) los abogados o abogadas y las notarias o los notarios admitidos a la práctica de la abogacía o notaría por el Tribunal Supremo de Puerto Rico, o abogados y abogadas de otra jurisdicción, siempre y cuando estén realizando un trámite en representación de sus clientes. Para esto, el abogado o abogada deberá acreditar dicha representación mediante identificación de admisión a la práctica de la abogacía o notaría en el Registro Demográfico de Puerto Rico. En el caso de abogados y abogadas o notarias y notarios que solicitan certificados de nacimiento, matrimonio y defunción, así como cualquier otro documento que el Registro Demográfico tenga autoridad para expedir, bastará con la presentación de una carta en la que se anuncie la representación legal bajo la firma y número del Registro Único de Abogados(as) (RUA). Igualmente, aplicará lo anteriormente expuesto cuando el abogado o abogada, notaria o notario, designe un gestor o gestora, empleados(as) o representante que acuda a su nombre al Registro a solicitar documentos. El Registro Demográfico no impondrá requisitos adicionales a los

---

[86] 24 LPRA § 1103.
[87] Para el procedimiento en cuestión, véase el Art.38 Ley Núm. 24 de 22 de abril de 1931 24 LPRA § 1237.
[88] 31 LPRA § 7646, Art. 689.

aquí taxativamente establecidos, mediante reglamentos o cartas circulares internas; y

(f) los directores y directoras funerales debidamente licenciados y autorizados, siempre y cuando sus gestiones se relacionen con la solicitud de certificaciones de actas de defunción en representación de sus clientes.[89]

## I. Derecho al Acceso a la información en Puerto Rico

En Puerto Rico existe un derecho fundamental al acceso a la información pública el cual está estrechamente relacionado con los derechos a la libertad de palabra, prese y asociación.[90] Este derecho se funda en la idea de que todas las personas tienen legitimación activa para saber y conocer acerca de los asuntos gubernamentales.[91] La razón de ello obedece a esta sencilla premisa: "[s]in conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años".[92] Esto se convierte en "un vehículo de información y opinión [para] informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla".[93]

Así pues, este derecho fundamental se ha ido desarrollando a través de la jurisprudencia. En *Santiago v. Bobb y El Mundo, Inc,*[94] el Tribunal Supremo de Puerto Rico concluyó que el secretismo de los asuntos públicos es la excepción y no la norma.[95] En ese sentido, se concluyó que un reclamo de confidencialidad por parte del Estado únicamente podía prosperar en limitadas circunstancias, las cuales son las siguientes:

(1) una ley así lo declara;

---

[89] *Id.*
[90] *Kilómetro 0 v. Pesquera López et al.,* 207 DPR 200, 207 (2021).
[91] *Id.*
[92] *Soto v. Srio. de Justicia,* 112 DPR 477, 485 (1982).
[93] *Santiago v. Bobb y El Mundo, Inc.,* 117 DPR 153, 159 (1986).
[94] *Santiago v. Bobb y El Mundo, Inc.,* 117 DPR 153 (1986).
[95] *Id.* a la pág. 159.

(2) la comunicación está protegida por algún privilegio evidenciario;

(3) la divulgación de la información puede lesionar derechos fundamentales de terceros;

(4) se trate de un confidente, según la Regla 515 de Evidencia de 2009 (32 LPRA Ap. VI), o

(5) sea información oficial conforme a la Regla 514 de Evidencia de 2009.[96]

Asimismo, se ha reconocido que este derecho no es ilimitado ni absoluto.[97] Toda ley que pretenda ocultar información a un ciudadano bajo el fundamento de confidencialidad tiene que justificarse a plenitud y contener normas claras y precisas que permitan identificar adecuadamente el material y las circunstancias en que habrá de aplicarse la norma de accesibilidad.[98] Ahora bien, para que opere este derecho es necesario que el documento que se pretenda divulgar goce, de esa condición pública.[99]

Una vez se determine que el documento al que se pretende acceder es público, el ciudadano común tendrá derecho a solicitar su acceso y el Estado solo podrá negarse en determinadas circunstancias.[100] Ello quiere decir que el Estado no puede negarse caprichosamente y de forma arbitraria a permitir el acceso de información pública.[101] Así pues, las restricciones que el Estado imponga para negar información solicitada deben satisfacer los criterios de un escrutinio estricto.[102]

Cuando el Estado alegue la confidencialidad de algún documento público, este "tiene la carga de probar que satisface cualquiera de las excepciones antes enumeradas" reconocidas en el caso de *Santiago v. Bobb y el Mundo Inc.*[103] De esta manera, el examen judicial que debe someterse cualquier reclamo de

---

[96] *Engieneering Services v. AEE*, 205 DPR 136, 148 (2020) citando a *Santiago v. Bobb y El Mundo, Inc.*, supra.

[97] *Lopez Vives v. Policia de P.R.,* 118 DPR 219, 228–229 (1987).

[98] *Angueira v. J. L. B. P.,* 150 DPR 10, 24, (2000).

[99] *Bhatia Gautier v. Gobernador*, 199 DPR 59, 81 (2017).

[100] *Kilómetro 0 v. Pesquera López et al.,* supra, a la pág. 209.

[101] *Colon Cabrera v. Caribbean Petroleum*, 170 DPR 582, 590 (2007).

[102] *Engieneering Services v. AEE,* supra, a la pág. 148.

[103] *Id.*

confidencialidad de información pública dependerá de la excepción que invoque el Estado como fundamento *vis-à-vis* el pedido de información.[104] Ahora bien, entre estos dos (2) derechos, la balanza debe inclinarse a favor del reclamante de la solicitud y en contra del privilegio.[105]

Por consiguiente, la negativa del Estado al divulgar asuntos públicos debe estar fundamentada y justificada.[106] No es suficiente plantear meras generalizaciones.[107] Por ello, los tribunales deben ser cautelosos en conceder livianamente cualquier pedido de confidencialidad del Estado.[108] Así pues, el Estado es "quien tiene el peso de demostrar que la confidencialidad de un documento público se justifica mediante un interés apremiante".[109]

**J. Derecho a la intimidad en Puerto Rico**

En Puerto Rico la intimidad de un ciudadano está protegida por virtud de la Cuarta Enmienda de la Constitución de Estados Unidos de América y el Art. II, Secs. 1, 8 y 10 de la Constitución del Estado Libre Asociado de Puerto Rico. Concretamente, el lenguaje contenido en las aludidas disposiciones constituciones en nuestra jurisdicción son las ilustradas a continuación:

> Sección 1. — La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.
>
> […]
>
> Sección 8. — Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar.
>
> […]

---

[104] *Ortiz v. Dir. Adm. De Los Tribunales*, 152 DPR 161, 178 (2000).
[105] *Kilómetro 0 v. Pesquera López et al.,* supra, a la pág. 218.
[106] *Id.*
[107] *Santiago v. Bobb y El Mundo, Inc.*, supra, a la pág. 159.
[108] *Engieneering Services v. AEE*, supra, a la pág.149.
[109] *Kilómetro 0 v. Pesquera López et al.,* supra, a la pág. 217.

Sección 10. — No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

No se interceptará la comunicación telefónica.

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar o registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.[110]

En ese sentido, nuestro derecho a la intimidad es de alta jerarquía en nuestro ordenamiento constitucional y aplica *ex proprio vigore,* por lo cual puede hacerse valer entre personas privadas y así estar exento del requisito de acción estatal.[111] Así pues, ha sido norma firmemente reiterada que este derecho goza de la más alta protección bajo nuestra Constitución.[112] Ello, pues, esta protección es "necesaria no sólo para que se pueda lograr una adecuada paz social o colectiva [...] sino también porque así logramos mantener una calidad mínima de la vida humana, al mantener un reducto de ésta fuera del alcance de terceros".[113]

Por tal motivo, este derecho constitucional puede ser reivindicado por recurso de interdicto o por una acción en daños e "impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos".[114] Sin embargo, pese a esta condición de ser de la más alta jerarquía en nuestro ordenamiento constitucional, este no se concibe como un derecho absoluto que "vence a todo otro valor en conflicto bajo todo supuesto concebible".[115] Por ello, ante una alegación de violación a la intimidad, lo que se debe tomar en consideración es si una persona

---

[110] Art. II, Secs. 1,8,10, Const. PR, LPRA, Tomo 1.
[111] *Siaca v. Bahía Beach Resort,* 194 DPR 559, 582-583 (2016).
[112] *Lopez Tristani v. Maldonado,* 168 DPR 838, 849 (2006).
[113] *Id.*
[114] *Id.,* a la pág. 850.
[115] *E.L.A. v. P.R. Tel. Co.,* 114 DPR 394, 401 (1983).

tiene derecho a abrigar, donde sea, dentro de la circunstancia del caso específico, la expectativa de que su intimidad se respete.[116]

De esta forma, para hacer tal determinación es necesario que se materialicen dos elementos: "(1) el subjetivo, mediante el cual el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete, y (2) el criterio objetivo, es decir, si la sociedad considera razonable tener tal expectativa".[117]

III

En el presente recurso, el apelante alega que debemos revocar la *Sentencia* que el foro primario emitió y notificó el 8 de enero de 2024. En específico, en su *primer* señalamiento de error, sostiene que el TPI incidió al ordenar la divulgación total de los datos contenidos en los certificados de defunción sin eliminar ciertos campos. Aduce que el mismo contiene información personal y sensitiva de personas fallecidas y sus informantes y a su vez plantea la existencia de una alegada expectativa razonable de intimidad de los datos solicitados. A su vez, en su *segundo* señalamiento de error, argumenta que el TPI erró al ordenar la divulgación prospectiva de las bases de datos en cuestión, violentándose así el principio constitucional de justiciabilidad. Por su parte, la apelada reitera que la información solicitada constituye información pública la cual debe ser entregada conforme a nuestro estado derecho.

De entrada, es menester destacar que el presente recurso versa sobre la cuarta petición de *Mandamus* instada por el CPI contra el Estado, en pleitos independientes, concretamente, contra el Registro Demográfico. Pese a que concurren la más perfecta identidad entre las cosas, las causas, las personas de los litigantes

---

[116] *Id.*, a la pág. 402.
[117] *Pueblo v. Santiago Feliciano*, 139 DPR 361, 384 (1995).

y la calidad en la que fueron,[118] no estamos en posición de aplicar la doctrina de cosa juzgada ni el impedimento colateral por sentencia. Esto responde a que, en el caso de autos, estamos ante una excepción a la aplicación de esta doctrina. Lo anterior, puesto a que el presente pleito versa sobre un asunto de alto interés público: la reiniciación de derechos constitucionales fundamentales. En ese sentido, se aplica la excepción a la norma de cosa juzgada reconocida por nuestra jurisprudencia,[119] por lo cual procederemos a entrar a los méritos de la controversia. Veamos.

Comenzaremos discutiendo el *primer* señalamiento de error formulado por el apelante. Allá, para los años 2018, 2020 y 2021, el foro dictaminó, en sentencias diferentes, que el Estado debía entregar las bases de datos de los certificados de defunción. Si bien las sentencias de los casos SJ2020CV02641 y SJ2021CV05403, fueron dictámenes que obedecieron a una transacción entre las partes, el caso SJ2018CV00843, el cual se consolidó con SJ2018CV00561, resuelto en el 2018, fue atendido en sus méritos. Allí, el TPI determinó que las bases de datos del Registro Demográfico sobre los certificados de defunción constituían un documento público, por lo cual el Estado venía obligado a su producción.[120]

A la luz de lo resuelto en los dictámenes antes mencionados, el CPI tenía legitimación activa para solicitar dicha información. En vista de ello, en varias ocasiones entre agosto de 2022, hasta febrero de 2023, la apelada solicitó dicha base de datos y el Estado se las proveyó.[121]

---

[118] *Ortiz Matías v. Mora Development*, 187 DPR 649, 655 (2013).

[119] Véase, *Beníquez et al v. Vargas et al*, 184 DPR 210, 255 (2012) y *Pérez v. Bauza*, 83 DPR 220, 226 (1961), donde se reconoce que los tribunales podemos prescindir de la aplicación de la doctrina de cosa juzgada en casos de alto interés público.

[120] Apéndice del recurso, a la pág. 177.

[121] Apéndice del recurso, a las págs. 63-75.

Ahora bien, el 5 de junio de 2023, el apelante suministró la información con varios campos suprimidos.[122] Tras el CPI cuestionar la razón por la cual se suprimieron estos datos, el Secretario de Salud justificó esta acción amparándose en varias disposiciones de la HIPAA.[123] Ante este proceder por parte del Estado, el CPI instó el auto de *Mandamus* objeto de esta controversia. Por su parte, el Estado respondió con un escrito solicitando la desestimación en la cual adujo que cumplió con su deber ministerial ya que proveyó la información solicitada, pero que suprimió ciertos campos que a su juicio eran confidenciales. Para ello, invocó dos fundamentos: (i) que tanto la HIPAA como la *Ley del Registro Demográfico,* así como la *Ley de Datos Abiertos* disponían su confidencialidad y (ii) que se lesionaban derechos fundamentales de terceros al divulgarse esta información.

Nuestra jurisprudencia ha sido diáfana en cuanto a los elementos que debemos observar cuando se está invocando el derecho constitucional al acceso a la información pública. Así pues, lo primero que se debe evaluar es si la información solicitada constituye un documento público. Para ello, la casuística ha planteado los distintos mecanismos para determinar esa clasificación.[124] Sin embargo, en el presente caso, esta consideración ha sido superada toda vez que, en sus respectivos escritos, ambas partes han convenido que el documento solicitado es público.[125] Por ello, siendo la base de datos de los certificados de defunción un documento público, el CPI y cualquier otro ciudadano, tenía legitimación activa para acceder a esta.[126]

Así las cosas, cuando el Estado le entregó la información al CPI con los cuarenta y un (41) campos suprimidos, invocó la

---

[122] Apéndice del recurso, a las págs. 77-79.
[123] Apéndice del recurso, a las págs. 80-82.
[124] *Ortiz v. Dir. Adm. De Los Tribunales,* supra, a las págs. 176-177.
[125] Véase, Apéndice del recurso, a la pág. 390 y a la pág. 452.
[126] *Kilómetro 0 v. Pesquera López et al.,* supra, a la pág. 209.

confidencialidad de dicho documento público. Nuestro ordenamiento jurídico requiere que cuando el Estado plantee la confidencialidad de un documento público, dicha actuación debe satisfacer un **escrutinio estricto**. Ello significa que el (i) Estado tiene el peso de la prueba;[127] (ii) la justificación para negarse a proveer información pública debe obedecer a un interés apremiante;[128] (iii) su negativa de divulgar asuntos públicos debe estar fundamentada y justificada, por lo cual no es suficiente plantear meras generalizaciones;[129] y (iv) la negativa a proveer información pública debe obedecer a las excepciones que han sido reconocidas por el Tribunal Supremo de Puerto Rico.[130] Sobre lo anterior, es menester señalar que las excepciones en cuestión son las siguientes: (a) una ley así lo declara; (b) la comunicación está protegida por algún privilegio evidenciario; (c) la divulgación de la información puede lesionar derechos fundamentales de terceros; (d) se trate de un confidente, según la Regla 515 de Evidencia de 2009; y (e) sea información oficial conforme a la Regla 514 de Evidencia de 2009.[131]

En el caso ante nuestra consideración, el Estado invocó dos (2) excepciones para no brindar acceso a información pública, entiéndase: (i) el que una ley así lo declara; y (ii) el que la divulgación de la información puede lesionar derechos fundamentales de terceros. A continuación, procederemos a analizar cada uno de estos fundamentos a tenor con los lineamientos pautados por nuestra jurisprudencia.

En *primer* lugar, cuando el Estado promueve un planteamiento de negar acceso a información pública bajo el fundamento de que esta es confidencial por virtud de una ley, se

---

[127] *Engieneering Services v. AEE*, supra, a la pág.160.
[128] *Kilómetro 0 v. Pesquera López et al.,* supra, a la pág. 217.
[129] *Id.*, a la pág. 210.
[130] *Id.*
[131] *Id.*

debe tomar en consideración lo siguiente: "[t]oda *ley* que pretenda ocultar información a un ciudadano bajo el palio de la confidencialidad tiene que **justificarse a plenitud** y contener **normas claras y precisas** que permitan identificar adecuadamente el material y las circunstancias en que habrá de aplicarse la norma de accesibilidad".[132] (Énfasis suplido). Si la legislación no tiene los estándares apropiados para determinar si el documento planea una norma de confidencialidad absoluta, no podrá superar el rigor de la cláusula constitucional que garantiza el derecho a la libre expresión.[133]

En este caso, el Estado razonó como justificación para su negativa a proveer los campos suprimidos tres (3) leyes: (i) la HIPAA; (ii) la *Ley del Registro Demográfico*; (iii) y la *Ley de Datos Abiertos*. Tras un estudio minucioso de las legislaciones antes mencionadas, no encontramos ningún lenguaje **claro y preciso** que justifique catalogar como confidencial la información suprimida. Coincidimos con el foro primario en su análisis concerniente a que la HIPAA no es aplicable a la controversia de autos, toda vez que el Registro Demográfico no es un *covered entity* según definido por dicho estatuto.[134] A su vez, la *Ley del Registro Demográfico* no contiene ningún lenguaje que nos lleve a concluir que su base de datos sobre certificados de defunción contenga información confidencial. Finalmente, coincidimos con la interpretación del foro primario en cuanto a la inaplicabilidad de las restricciones disposiciones en la

---

[132] *Angueira v. J. L. B. P.*, supra, a la pág. 24.

[133] *Nieves v. Junta*, 160 DPR 97, 104 (2003).

[134] Except as otherwise provided, the standards, requirements, and implementation specifications adopted under this part apply to the following entities:

    (1) A health plan.
    (2) A health care clearinghouse.
    (3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.

45 CFR § 164.104

*Ley de Datos Abiertos* toda vez que este estatuto no expresa de manera clara y precisa que los datos solicitados no puedan divulgarse.

En conclusión, tras un análisis ponderado de los estatutos invocados, colegimos que ninguna de las leyes expuestas por el Estado contiene un lenguaje que establezca la confidencialidad de los datos suprimidos. Por ello, el Estado no logró justificar su negativa de brindar acceso la información pública solicitada bajo el fundamento de que una ley así dispone su confidencialidad.

Ahora bien, en *segundo* lugar, el apelante también adujo que la divulgación de la información solicitada podría lesionar derechos fundamentales de terceras personas. Concretamente, hizo alusión a que la divulgación de datos tales como los nombres, apellidos, direcciones, nombre del cónyuge, nombre del padre y de la madre, así como el nombre y dirección del informante constituye una violación al derecho de la intimidad de estas personas y sus familiares. Particularmente, el Estado sostuvo que en nuestro ordenamiento jurídico se reconoce que nadie puede inmiscuirse en la vida privada o familiar de los demás seres humanos.

Es preciso reiterar que, en el caso ante nuestra consideración, no existe controversia en cuanto a que el documento solicitado es público, por lo cual el apelante viene obligado a satisfacer un escrutinio estricto si optara por no proveer dicha información pública. **Esto quiere decir que el Estado tiene el peso de la prueba de demostrar, en esta circunstancia, que se está lesionando el derecho fundamental de la intimidad.** En otras palabras, el Estado venía obligado a demostrar que tanto a los familiares de las personas fallecidas y a los informantes, le cobijaba un derecho a la intimidad en cuanto a la información divulgada. Para ello, le correspondía demostrar si la persona que reclama ese derecho a la intimidad tenía el derecho de abrigar, en la

circunstancia del caso específico, que su intimidad se respetara.[135] Además, el Estado debía demostrar dos criterios adicionales en cuanto a la expectativa de intimidad: (i) el criterio subjetivo, mediante el cual el que reclama el derecho, alberga una expectativa real de que su intimidad se respete y (ii) el criterio objetivo, el cual consiste en si la sociedad considera razonable tener tal expectativa.[136]

Nótese que, el apelante tenía que demostrar lo anterior, satisfaciendo las exigencias de un **escrutinio estricto**. No basta con expresar meras generalizaciones. Conforme surge del expediente ante nuestra consideración, el apelante no presentó prueba para sustentar sus alegaciones más allá de una captura de pantalla de las bases de datos solicitadas y una tabla que ilustraba cuáles eran los campos de dicha base de datos.[137] El Estado no presentó prueba adicional (testifical ni documental) para demostrar la expectativa de intimidad de las personas que resultarían afectadas con la divulgación ni bajo el criterio subjetivo ni el criterio objetivo conforme lo requiere nuestro estado de derecho.

A la luz del análisis que antecede, concluimos que el apelante no pudo probar que la divulgación de los datos solicitados lesionaría los derechos fundamentales de terceras personas. Siendo el Estado el llamado a demostrar la confidencialidad de la información pública suprimida, cosa que no logró probar conforme lo exige nuestro estado derecho, determinamos que el foro primario no incidió en su determinación de ordenar la divulgación total de las bases de datos según solicitada por el CPI. Por consiguiente, resolvemos que el *primer* señalamiento de error no se cometió.

---

[135] *E.L.A. v. P.R. Tel. Co.,* supra, a la pág. 401.

[136] *López Tristani v. Maldonado,* supra, a la pág. 852.

[137] Apéndice del recurso, a la pág. 375.

Por otro lado, en su *segundo* señalamiento de error, el apelante también sostiene que el TPI erró al ordenar la producción de la base datos al CPI de forma prospectiva, pese a que esto contraviene el principio constitucional de justiciabilidad. Colegimos que le asiste la razón. Nos explicamos.

En este punto, destacamos que, en la *Sentencia* apelada, el foro primario emitió la siguiente expresión:

> Además, y en atención a las circunstancias particulares del presente caso y al derecho declarado y aclarado en esta Sentencia, se ordena a la parte peticionada que divulgue prospectivamente esta información cuando le sea solicitada por la parte peticionaria, en los mismos términos en los que le sea ordenado divulgar, y en cumplimiento con el Artículo 4 de la Ley de Transparencia y Procedimiento Expedito para el Acceso a la Información Pública, Ley Núm. 141-2019, 3 LPRA sec. 9914, y con la normativa constitucional aplicable sobre acceso a la información pública (nota omitida).[138]

Dicho lenguaje es confuso y pudiese ser controversial toda vez que podría interpretarse como una autorización irrestricta para que el CPI solicite esta base datos sin importar las circunstancias. Ello entra en conflicto con la máxima de que en nuestro ordenamiento el derecho es rogado y este lenguaje pudiese interpretarse como una pre-adjudicación de futuras controversias, ya sea porque el estado de derecho sea uno distinto o porque surja alguna otra circunstancia que sea meritoria ser examinada por los tribunales. Ello tampoco representa una licencia para que el Estado se oponga a producir una información que ha sido reiterada como pública mediante distintas sentencias. No obstante, pese a lo anterior, las solicitudes de estos datos públicos deben ser atendidas caso a caso conforme a la particularidad de las circunstancias. Por tal motivo, concluimos que el foro primario incidió al ordenar la producción de las bases de datos de forma prospectiva, por lo cual el *segundo* señalamiento de error se cometió.

---

[138] Apéndice del recurso, a las pág. 585.

Por último, esta Curia se une a la exhortación que hiciera el foro primario en su *Sentencia* referente a la naturaleza de los datos que solicitados por el CPI. Si bien, jurídicamente dicha información no es confidencial y es pública, coincidimos en que la misma podría considerase sensitiva para muchas personas en nuestra sociedad. Por tal motivo, hacemos un llamado a la prudencia y a la discreción en cuanto a que se tomen las precauciones ciudadanas sobre el manejo o posible publicación de la información obtenida, a tono con los preceptos que rigen la profesión del periodismo en Puerto Rico.

IV

Por los fundamentos que anteceden, *se modifica* la *Sentencia* apelada únicamente a los efectos de eliminar el lenguaje referente a la orden de divulgación de datos de manera prospectiva. Así modificada, *se confirma.*

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones